THE HONORABLE RICARDO S. MARTINEZ

1
2
3
4
5
6
7
8
9
10
11
12
13                          UNITED STATES DISTRICT COURT
14                          WESTERN DISTRICT OF WASHINGTON
15                                      AT SEATTLE
16
17
18   ROBERT KENNY,                         No. CV 14-1987-RSM
19
20              Plaintiff,                  DEFENDANTS' MOTION TO DISMISS
21
22        v.                               NOTE ON MOTION CALENDAR: April 3,
23                                          2015
24   PACIFIC INVESTMENT
25   MANAGEMENT COMPANY LLC, a             ORAL ARGUMENT REQUESTED
26   Delaware limited liability company;
27   PIMCO INVESTMENTS LLC,
28
29              Defendants.
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM)

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ...................................................................................... 3

    A.    Mutual Funds and the Investment Company Act of 1940.................................................................................... 3

    B.    PIMCO and the Total Return Fund.................................... 5

    C.    Service Agreements and Fees ........................................... 7

        1.    Investment Advisory Contract ...................................... 7

        2.    Supervision and Administration Agreement................................ 9

        3.    Distribution and Servicing Plans and Fees ................. 10

    D.    PIMCO Funds Board of Trustees and the Contract Approval Process ......................................................... 11

ARGUMENT........................................................................................ 14

    I.    COUNT I FAILS TO STATE A PLAUSIBLE CLAIM FOR EXCESSIVE ADVISORY AND ADMINISTRATIVE FEES UNDER SECTION 36(B) OF THE ICA................................................................................ 14

    A.    Legal Standard for Pleading a Section 36(b) Claim ................ 14

    B.    The Complaint Misconstrues *Jones v. Harris Associates* and Fails to Assert the Plaintiff's Claim under the Correct Standard of Liability ................. 15

    C.    The Plaintiff's Conclusory Allegations About the Fund's Size and Presumed Economies of Scale Do Not Plausibly Establish that the Fees Were Outside the Range of What Could Have Been Bargained for at Arm's Length ...................................................... 16

    D.    The Plaintiff's Comparison of TRF Fees to Those Charged to Other Types of Clients Are Inapt ......................... 19

    E.    The Plaintiff's Recitation of the Remaining *Gartenberg* Factors Provides No Basis for a Conclusion that the Fees Were Outside an Arm's-Length Range ...................................................... 24

        1.    The Plaintiff Fails to Allege that the Nature and Quality of the Services Provided by PIMCO Did Not Warrant PIMCO's Compensation ...................................................... 24

        2.    The Complaint Alleges no Basis to Question the Independence or Thoroughness of the Fund's Independent Trustees ................................. 26

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**TABLE OF CONTENTS**
**(continued)**

3.   The Complaint's Allegations on the Fund's Profitability to the Adviser and Employee Compensation Have no Bearing on Whether the Fees are Beyond an Arm's-Length Range .......................................................... 28

4.   The Plaintiff Does Not Sufficiently Allege "Fall-Out" Benefits ................................................. 30

II.   COUNT II FAILS TO STATE A PLAUSIBLE CLAIM FOR EXCESSIVE DISTRIBUTION AND SERVICING FEES UNDER SECTION 36(B) OF THE ICA .................................................. 31

III.   THE PLAINTIFF LACKS STANDING TO ASSERT CLAIMS ON BEHALF OF SHARE CLASSES HE DOES NOT OWN ............................................................................ 33

IV.   SECTION 47(B) OF THE ICA PROVIDES NO SEPARATE BASIS FOR A RESCISSION CLAIM .......................................... 36

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – ii

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Mut. Funds Fee Litig.*,
  No. 04-CV-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009) ...........................................30

*Amron v. Morgan Stanley Inv. Advisors, Inc.*,
  464 F.3d 338 (2d Cir. 2006)....................................................................................27, 29

*Arduini v. Hart*,
  774 F.3d 622 (9th Cir. 2014) ...............................................................................................35

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................................14, 17, 28

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................................14, 17

*Burks v. Lasker*,
  441 U.S. 471 (1979)..................................................................................................................4

*Caviness v. Horizon Cmty. Learning Ctr., Inc.*,
  590 F.3d 806 (9th Cir. 2010) ...............................................................................................14

*Davis v. Bailey*,
  No. 05-civ-00042, 2005 WL 3527286 (D. Colo. Dec. 22, 2005) ...........................................36

*Gallus v. Ameriprise Fin., Inc.*,
  675 F.3d 1173 (8th Cir. 2012) .......................................................................................15, 16

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
  694 F.2d 923 (2d Cir. 1982)........................................................................................ passim

*Hoffman v. UBS-AG*,
  591 F. Supp. 2d 522 (S.D.N.Y. 2008)....................................................................17, 22, 23

*In re Evangelist*,
  760 F.2d 27 (1st Cir. 1985)..................................................................................................36

*In re Franklin Mut. Funds Fee Litig.*,
  478 F. Supp. 2d 677 (D.N.J. 2007) .........................................................................18, 25, 36

*In re Gartenberg*,
  636 F. 2d 16 (2d Cir. 1980)..................................................................................................36

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – iii

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
    528 F. Supp. 2d 332 (S.D.N.Y. 2007)......................................................................17

*In re Scudder Mut. Funds Fee Litig.*,
    No. 04 Civ.1921 (DAB), 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) ...............17

*Jones v. Harris Assocs. L.P.*,
    559 U.S. 335 (2010)............................................................................. passim

*Kalish v. Franklin Advisers, Inc.*,
    74 F. Supp. 1222 (S.D.N.Y. 1990)......................................................................17

*Kamen v. Kemper Fin. Servs., Inc.*,
    908 F.2d 1338 (7th Cir. 1990) .............................................................................36

*Kasilag v. Hartford Investment Financial Services, LLC*,
    No. 11-civ-1083, 2012 WL 6568409 (D.N.J. Dec. 17, 2012) ...............................35

*Krantz v. Fid. Mgmt. & Research Co.*,
    98 F. Supp. 2d 150 (D. Mass. 2000) ...................................................................27

*Krantz v. Prudential Invs. Fund Mgmt. LLC*,
    305 F.3d 140 (3d Cir. 2002)..................................................................................26

*Krantz v. Prudential Invs. Fund Mgmt. LLC*,
    77 F. Supp. 2d 559 (D.N.J. 1999) ..................................................................27, 28

*Krinsk v. Fund Asset Mgmt., Inc.*,
    875 F.2d 404 (2d Cir. 1989)..................................................................5, 16, 23, 30

*Langner v. Brown*,
    913 F. Supp. 260 (S.D.N.Y. 1996) .......................................................................27

*Larson v. Dumke*,
    900 F.2d 1363 (9th Cir. 1990) ..............................................................................35

*Migdal v. Rowe Price-Fleming Int'l Inc.*,
    248 F.3d 321 (4th Cir. 2001) ............................................................14, 23, 25, 27

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
    No. AMD 98-2162, 2000 WL 350400 (D. Md. Mar. 20, 2000)............................23

*Olesh v. Dreyfus Corp.*,
    No. CV-94-1664, 1995 WL 500491 (E.D.N.Y. Aug. 8, 1995)..............................27

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – iv

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

*Pfeiffer v. Bjurman, Barry & Assocs.*,
   No. 03-civ-9741(DLC), 2006 WL 497776 (S.D.N.Y. Mar. 2, 2006) ......................................32

*Verkouteren v. Blackrock Fin. Mgmt., Inc.*,
   37 F. Supp. 2d 256 (S.D.N.Y. 1999) ...................................................................................27

*Yameen v. Eaton Vance Distribs., Inc.*,
   394 F. Supp. 2d 350 (D. Mass. 2005) ..............................................................................31, 32

STATUTES

Investment Company Act of 1940, 15 U.S.C. § 80a *et seq*. .................................................. passim

RULES

Fed. R. Civ. P. 23.1 ......................................................................................................34, 35

OTHER AUTHORITIES

17 C.F.R. 270.12b-1(b)(3)(ii) ...........................................................................................12

Order Approving Proposed Rule Change Relating to the Limitation of
   Asset-Based Sales Charges as Imposed by Investment Companies,
   Securities and Exchange Act of 1934 Release No. 30897, 57 Fed. Reg.
   30985 (July 13, 1992) .................................................................................................32

S. Rep. No. 91-184 (1970), reprinted in 1970 U.S.C.C.A.N. 4897 ..............................................30

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – v

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

This is ostensibly an action for "excessive" fees in violation of Section 36(b) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-35(b).  Plaintiff Robert Kenny brings this action against Pacific Investment Management Company LLC ("PIMCO") and PIMCO Investments LLC ("PIMCO Investments"), respectively the investment adviser and distributor of the PIMCO Total Return Fund ("TRF" or the "Fund"), in which Mr. Kenny holds Class A shares.

## PRELIMINARY STATEMENT

The Fund was until recently the world's largest mutual fund.  At its zenith, the Fund's aggregate assets amounted to over $290 billion.  The Fund attracted these assets – over many years in a competitive marketplace featuring multiple hundreds of comparable mutual fund alternatives – by delivering consistently stellar performance and by keeping aggregate fees for investment management and all other services at or below its competitors' charges.  According to Morningstar, an industry analyst cited repeatedly by the plaintiff, over the last ten years TRF's performance ranked fourth out of the 587 funds in its category for its largest share class (accounting for about 65% of TRF's assets), producing average annual returns 1.28% greater than its benchmark index and 1.58% more than the average of funds in its category.  Yet the Fund paid total fees and expenses that were less than the median expenses among its category and only about half of the average total expenses for similar funds.  In Class A shares (which the plaintiff holds), TRF ranked tenth out of the 587 similar funds, and outperformed its category by 1.12% annually in the same ten-year period.  Again, total expenses for the Class A shares were at or below both the mean and the median expenses for similar funds.  Stated differently, had investors bought virtually any other fund in TRF's Morningstar category, they would have both paid *more* in expenses and obtained *lower* overall returns.

The plaintiff nevertheless claims that fees paid by TRF to PIMCO were "excessive." Compl. ¶ 1.  Indeed, he claims the Fund's fees were so high they "*could* not have been the product of arm's-length negotiations."  *Id*. (emphasis added); *see Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (2010) (to prove a Section 36(b) violation, the plaintiff must demonstrate that

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 1

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

the challenged fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining") (citing *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982)) (emphasis added).

But that makes no sense. Fees that are equal to or less than what competitors charge for producing inferior results surely are not *beyond* what could be produced by an arm's-length bargain. To the contrary, fees that are at or *below* the mean and median of TRF's competitors are easily within the range of fees that investors reasonably expect to pay, as measured by the market for similar funds they could buy but choose to shun. And they are accordingly well within the range of fees for which TRF's independent trustees "could" fairly bargain for with PIMCO.

The plaintiff's Complaint does not allege particularized facts to the contrary. Rather, the pleading is a polemic aimed generally at mutual fund fees, and fees paid by "large" funds in particular. The Complaint selectively quotes academic perspectives and industry commentary to suggest that *all* mutual fund fees are too high, especially when compared to investment management fees charged to other types of accounts receiving different services. And it rails against "large" funds by asserting conclusorily that they "must" not share economies of scale. But those generalized allegations are untethered to specific factual allegations about TRF's fees and expenses; a comparison to its competitors; the services PIMCO delivers; or any details about the annual negotiation of fees between the Fund's independent trustees and PIMCO.

That absence of specifics is dispositive. As the U.S. Supreme Court has said, a plaintiff alleging excessive mutual fund fees is not automatically entitled to a trial on his claim. Rather, he must show "[f]irst . . . that fees are *beyond* the range of arm's-length bargaining." *Jones*, 559 U.S. at 350 n.8 (emphasis added). And when the basis of his claim is a comparison to other clients, much more is required. Disparate fees alone are not sufficient. "Only where plaintiffs have shown a large disparity in fees that cannot be explained by the different services *in addition to other evidence that the fee is outside the arm's-length range* will trial be appropriate." *Id.* (emphasis added). While the plaintiff need not produce evidence at this stage, he must allege

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 2

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

particularized facts that would plausibly support such a finding.  The Complaint is hopelessly devoid of the necessary specifics.

Similarly, the plaintiff's challenge to distribution and servicing fees paid by TRF to PIMCO Investments pursuant to a plan adopted by the Board of Trustees of the PIMCO Funds (the "Board") under Rule 12b-1 of the ICA ("12b-1 fees") is factually barren.  The pleading mainly sets forth a policy-based argument against 12b-1 fees not appropriate for a complaint.  It identifies no specifics about TRF's 12b-1 fees, the services provided or procured by PIMCO Investments in exchange for the fees, the related costs, or the benefits to the Fund that would permit even a plausible inference that the 12b-1 fees are excessive and *beyond* what could be bargained at arm's-length.

Finally, and more generally, *this* plaintiff does not allege any "injury" from "excessive" fees that is similar to any purported "injury" even conceivably sustained by the majority of TRF shareholders.  The plaintiff holds Class A shares, which account for only about 10% of the Fund's assets and which have a different fee structure than other share classes, including, significantly, the institutional share classes, which comprise over 80% of Fund assets.  For example, the plaintiff's Class A shares pay only a servicing component under the relevant 12b-1 plan, but no distribution fee of the type paid by other share classes.  Simply put, *this* plaintiff has no standing to challenge fees paid by other shareholders differently situated; to the contrary, his interests are in hopeless conflict with those of other shareholders.

Accordingly, and as set forth below, the Complaint should be dismissed with prejudice.

## BACKGROUND

### A.    Mutual Funds and the Investment Company Act of 1940

"A mutual fund is a pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the individual investors holding shares in the fund."  *Jones*, 559 U.S. at 338 (punctuation and citation omitted).  As a matter of industry practice, the management and operations of a mutual fund are typically externalized and contractually delegated to its investment adviser.  Since the enactment of the ICA, the Supreme Court and lower courts have

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 3

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

recognized the legal separation of a mutual fund and its adviser, and have acknowledged this distinction as a principal purpose of the ICA, which protects fund investors by maintaining a fund's independence from its adviser. *See Burks v. Lasker*, 441 U.S. 471, 480−87 (1979); 15 U.S.C. §§ 80a-10(a)-(b), 80a-15(a)-(c). The contractual "distributor" of a fund's shares – its principal underwriter, and typically (as here) a corporate affiliate of the adviser – markets fund shares to financial intermediaries that, in turn, sell shares to their individual investor-customers, and/or sells them directly to investors itself.

The ICA creates a regulatory structure designed to safeguard the interests of mutual fund shareholders. The statute entrusts "noninterested" directors or trustees sitting on a mutual fund's board (the "independent trustees") with the primary responsibility of protecting the fund and its shareholders from any conflicts of interest with the fund's adviser and distributor. A majority of independent trustees, who represent the "cornerstone" of the ICA's efforts to check conflicts of interest, *Jones*, 559 U.S. at 339, must approve the advisory and distribution contracts and 12b-1 plans annually, including the compensation received by the adviser and distributor for the services they provide to the fund. 15 U.S.C. § 80a-15(c); *accord Jones*, 559 U.S. at 340. To fulfill that obligation, the trustees must "request and evaluate" all information from the adviser reasonably necessary to evaluate the terms of the advisory contract with the funds. *See* 15 U.S.C. § 80a-15(c). The annual review and approval of the service agreements and compensation is accordingly referred to as the "15(c) approval process."

The ICA's reliance on independent trustees to police conflicts of interest between a fund and its adviser also lies at the heart of Section 36(b), which provides that an investment adviser owes a "fiduciary duty with respect to the receipt of compensation" from a mutual fund received by the adviser or its affiliate. 15 U.S.C. § 80a-35(b). The Supreme Court has made clear that, for a plaintiff to state a cognizable claim for a breach of this duty, the plaintiff must meet the high burden of showing that the fee charged is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining." *Jones,* 559 U.S. at 346 (citing *Gartenberg*, 694 F.2d at 928) (emphasis

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

added).  In making that inquiry, a court must consider – and give appropriate deference to – the role of the independent trustees in negotiating that fee:  "[A]pproval by the board of directors of such investment company of such compensation or payments . . . shall be given such consideration by the court as is deemed appropriate under all the circumstances."  15 U.S.C. 80a-35(b)(2).  The statute does not oblige the directors to negotiate the "'best deal' possible."  *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989).  And it does not authorize the Court to sit as a "super-trustee" charged with "setting" a fee, or to second-guess informed board decisions.  *See Jones*, 559 U.S. at 352.  It instead requires a plaintiff both to plausibly allege and ultimately to prove that the result of the independent trustees' negotiation was *outside* of what "could" have been bargained for at arm's-length.

### B.    PIMCO and the Total Return Fund

PIMCO serves as investment adviser to PIMCO Funds, a Massachusetts business trust that is an open-end management investment company registered under the ICA containing 91 publicly-offered separate series or "funds," including TRF, the only fund at issue in the Complaint.  *See* Knowles Decl.,[1] Ex. A (PIMCO Funds, Statement of Additional Information, at 1, 73, 177 (July 31, 2014, as supplemented Dec. 15, 2014) ("SAI")).

TRF has grown into the world's largest actively-managed bond fund based on decades of outstanding performance offered at or below average fee and expense levels.  *See* Knowles Decl., Ex. B (E. Jacobson & M. Herbst, *Morningstar's Current View on PIMCO*, Morningstar (Mar. 18, 2014)) (TRF "has been the largest or among the largest bond funds in existence for a long, long time, and its long-term risk-adjusted record has remained strong").  The analysts and commentators cited by the plaintiff in the Complaint demonstrate both the Fund's exceptional long-term performance and its modest fee and expense levels.  Morningstar, described in the Complaint as a "respected provider of independent investment research," (Compl. ¶ 55), compares TRF's investment performance and fees to a large peer group over various periods,

---

[1]     Declaration of Sean C. Knowles in Support of Defendants' Motion to Dismiss, filed concurrently herewith.  The public filings and reports and other documents referenced and relied upon by the plaintiff in the Complaint are attached to the Knowles Declaration at Exs. A – U and are discussed in the Request for Judicial Notice in Support of Defendants' Motion to Dismiss ("RJN"), filed concurrently herewith.

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 5

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

and reports that TRF's return for the ten-year period ending on the date the Complaint was filed ranked fourth out of 587 funds in its category for Institutional Class shares, producing 1.28% more return annually than its benchmark index and 1.58% more than the average of funds in its category.  Knowles Decl., Ex. C (Morningstar, Inc. Ratings PTTRX as of Dec. 31, 2014).  The performance for TRF's Class A shares ranked tenth out of the 587 similar funds in Morningstar's analysis, and outperformed its category by 1.12% in the same period.  Knowles Decl., Ex. D (Morningstar, Inc. Ratings PTTAX as of Dec. 31, 2014).  For both share classes, total expenses were at or below both the mean and the median expenses for similar funds, as shown below.

|  |  | TRF Institutional Class | TRF Class A |
|---|---|---|---|
| Performance | TRF 10-year annualized return (12/31/2014) | 5.99% | 5.53% |
|  | Peer group 10-year annualized return (12/31/2014) | 4.41% | 4.41% |
|  | TRF outperformance vs. peer group | 1.58% | 1.12% |
|  | Rank in peer group / # funds in group | 4/588 funds | 10/588 funds |
|  | Benchmark 10-year annualized return (12/31/2014) | 4.71% | 4.71% |
|  | TRF outperformance vs. benchmark | 1.28% | 0.82% |
| Fees | TRF total expenses (advisory, supervisory/administrative, 12b-1) | 0.46% | 0.85% |
|  | Median total expenses for peer group (for 2014) | 0.53% | 0.86% |
|  | Average total expenses for peer group (for 2014) | 0.89% | 0.89% |

*See* Knowles Decl., Ex. E (PIMCO Funds, Semiannual Report at 8 (Sept. 30, 2014) ("SR")) (comparing TRF's performance vis-a-vis its benchmark and peer group).  Sustaining this positive return for an extended duration is remarkable, particularly while charging below-average fees and expenses.

To be sure, TRF's performance in 2013−14 lagged its historical outperformance, with its first year of negative return since 1999 – as reported in an article cited by the plaintiff.  Knowles Decl., Ex. F (G. Zuckerman & K. Grind, *Inside the Showdown Atop Pimco, the World's Biggest Bond Firm*, WALL ST. J., Feb. 24, 2014).  As the Fund itself disclosed, 2013 was an especially volatile period in the fixed income market:

> Beginning in mid-May 2013 conditions in financial markets deteriorated as investors reacted to signals by the Federal Reserve ("Fed") that it might begin to slow the pace of its quantitative easing ("QE") asset purchase program. The shift in tone fueled a broad-based sell-off within fixed income assets throughout most of

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 6

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone: 617.951.7000
Fax: 617.951.7050

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

the summer, reducing market liquidity and pushing yields higher
across the risk spectrum.

Knowles Decl., Ex. G (TRF Annual Report at 2 (Mar. 31, 2014)).  The Fund's portfolio was

especially hard-hit by these movements, as it was positioned to take advantage of anticipated

increases in inflation and interest rates that did not materialize.  *Id.* at 2, 8–9.  Nonetheless, the

Fund's stellar long-term performance is well-established and widely acknowledged, even by

commenters cited (often, selectively) in the plaintiff's Complaint as critics of TRF.  *Id.* at 8.[2]

### C.   Service Agreements and Fees

#### 1.   Investment Advisory Contract

PIMCO serves as investment adviser to the Fund pursuant to an Investment Advisory

Contract ("Advisory Contract") between PIMCO and PIMCO Funds, which the Board,

including, separately, the independent trustees, must approve annually.  Knowles Decl., Ex. A

(SAI) at 73–74.   In this capacity, PIMCO provides the Fund with an array of complex,

specialized advisory services, including: (1) making and executing investment decisions with

counterparties selected by PIMCO; (2) continuous and significant investments in talent and

innovation, including investments in (a) information technology supporting investment

management and compliance, (b) new disciplines, (c) attracting and retaining talented personnel,

and (d) enhancing resources and systems; (3) providing the Board with periodic reports on TRF's

investment performance; and (4) managing TRF's counterparty risk, including requiring daily

collateral adjustments.  *Id.* at 73; Knowles Decl., Ex. E (SR) at 89–90; Knowles Decl., Ex. M

(PIMCO Funds Amended & Restated Investment Advisory Contract at pp. 2–3 ¶¶ 4(a)–(h) (Feb.

---

[2]       Morningstar has repeatedly praised the Fund's long-term performance, noting that despite a short-term performance dip in 2011, "the fund's longer record remains among the category's best."  Knowles Decl., Ex. H (Morningstar, PTTRX: Analyst Report, *It's not quite time to start worrying about this Fund*, Nov. 15, 2011).  In 2012, Morningstar extolled the Fund's "long record of outperformance," "excellent long-term record, which remains among the best in the category," and "long record of success."  Knowles Decl., Ex. I (Morningstar, PTTRX: Analyst Report, *Counting on discretion being the better part of valor*, June 28, 2012); Knowles Decl., Ex. J (Morningstar, PTTRX: Analyst Report, *A difficult pace to keep*, Sept. 10, 2012).  More recently, in 2014, Morningstar commented that the Fund's "long-term risk-adjusted record has remained strong."  Knowles Decl., Ex. K (Morningstar, *Stewardship Grade for Fund Firms PIMCO: The year 2014 is proving to be among PIMCO's most eventful*, Sept. 29, 2014 ("Morningstar Stewardship Report")); *see also* Knowles Decl., Ex. L (B. Ritholtz, *Guess How Much Money Bill Gross Made Last Year*, BLOOMBERGVIEW, Nov. 14, 2014) (referring to PIMCO's "unbeatable combination of a long history and outstanding long-term results").

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax: 617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

23, 2009), *available at* http://www.sec.gov/Archives/edgar/data/810893/000119312509057567/ dex99d12.htm (last visited Mar. 6, 2015)).  In August 2014, the trustees credited PIMCO for implementing an extensive list of *new* services and enhancements in the past year.  Knowles Decl., Ex. E (SR) at 90.

The plaintiff's suggestion that managing a bond fund like TRF entails nothing more than selecting and holding a set of government and corporate bonds, (*see* Compl. ¶ 109), is wildly oversimplified.  This conclusion, couched as a factual allegation, flatly contradicts the Fund's public disclosures, which demonstrate that the process and considerations associated with managing the Fund are remarkably complex:

> The Board considered PIMCO's discussion of the intensive nature of managing bond funds, noting that it requires the consideration of a number of factors, including: varying maturities, prepayments, collateral management, counter-party management, pay-downs, credit events, workouts, derivatives and net new issuance in the bond market.  The Board noted that in addition to managing these factors, PIMCO must also balance risk controls and strategic positions in each portfolio it manages.

Knowles Decl., Ex. E (SR) at 92.  This complexity requires investment management services that range far beyond simply buying and holding bonds.  TRF's holdings, detailed in the Semiannual Report, include a wide variety of derivatives and synthetic instruments – many of them negotiated as contracts with counterparties rather than purchased on exchanges – designed to provide the Fund with positive returns while managing against downside market risks such as interest rate variability, inflation, foreign currency rate movements, credit risk of bond issuers, and defaults by counterparties.  *Id.* at 20–60.  These instruments include futures contracts, credit default swaps, interest rate swaps, repurchase agreements, reverse repurchase agreements, total return swaps, forward foreign currency contracts, and various "swaptions."  *Id.*  The effective management of the Fund's portfolio, comprising literally thousands of different holdings, (*id.*), accordingly requires enormous resources and extraordinarily sophisticated risk management.

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## 2. Supervision and Administration Agreement

PIMCO also serves as the Fund's administrator pursuant to a Supervision and Administration Agreement ("SAA") that requires it to "provide[] or procure[] certain supervisory and administrative services and bear[] the costs of various third party services required by the Funds, including audit, custodial, portfolio accounting, legal, transfer agency and printing costs." *Id.* at 91; *see also* Knowles Decl., Ex. N (Second Amended and Restated Supervision and Administration Agreement at pp. 2–3, 5–6, ¶¶ 2(a) (i)–(viii) & 7 (Apr. 1, 2012), *available at* http://www.sec.gov/Archives/edgar/data/810893/000119312512241930/d311358dex99h1.htm (last visited Mar. 6, 2015)). PIMCO performs and/or procures an increasingly broad and complex set of supervisory and administrative services for the Fund, and pays virtually all of the costs associated with these services, including, but not limited to: (1) shareholder servicing functions, including preparing and printing shareholder reports and communications; (2) regulatory compliance, such as reports and filings with the SEC and state securities commissions; (3) general supervision of the operations of the Fund, including coordinating services performed by various outside parties; (4) registering the Fund's shares with the SEC; and (5) arranging at its own expense for the provision of legal, audit, custody, transfer agency and other services for the Funds. Knowles Decl., Ex. A (SAI) at 81. Under the SAA, PIMCO also provides TRF with office space and compensates those officers, employees, and trustees of PIMCO Funds who are affiliated with PIMCO. *Id.*

The Fund compensates PIMCO for this broad range of supervisory and administrative services through an "all-in" or "unified" fee structure. Knowles Decl., Ex. A (SAI) at 73; Knowles Decl., Ex. O (PIMCO Funds, Prospectus, at 55 (July 31, 2014, as supplemented Oct. 21, 2014) ("Prospectus")). By providing or procuring an ever-increasing number of services, and bearing the cost of third-party services, from a single fixed fee, PIMCO distinguishes itself from most other fund managers whose funds generally pay for third-party services separately, resulting in variable fees and expenses. Knowles Decl., Ex. E (SR) at 93. PIMCO's unified fee effectively creates a cap on TRF's administration expenses, which shields the Fund and its

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 9

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Phone: 617.951.7000
Fax: 617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

shareholders from rising operating costs during a market downturn or when Fund assets are otherwise diminished, including through redemptions.  *Id*. at 93–95.  In short, rather than passing through variable charges, PIMCO bears all the risk of the cost of such services as well as the risk that changes in levels of assets under management, including through sales by shareholders, will shrink the revenue generated to pay for those costs.  As a result of PIMCO's unified fee, shareholders have enjoyed the benefit of a predictable and transparent fee structure at a lower cost than many competitors.  *Id*. at 94–95.[3]

### 3.     Distribution and Servicing Plans and Fees

The payment of fees by a mutual fund to support the sale of fund shares is governed by Rule 12b-1 promulgated under the ICA.  The Fund has adopted separate distribution and/or servicing plans ("12b-1 Plans") for its Class A, B, C, and R shares (the "Retail Plans"), as well as for Administrative Class and Class D shares.  Knowles Decl., Ex. A (SAI) at 102–03, 115, 117.  The Retail Plans authorize TRF to pay so-called "12b-1 fees" on an annual rate basis to PIMCO Investments – a wholly-owned subsidiary of PIMCO which serves as the principal underwriter of the Fund's shares – as compensation for services it provides or procures "in connection with the sale and distribution of Fund shares ('distribution fees') and/*or* in connection with personal services provided to Fund shareholders and the maintenance of shareholder accounts ('servicing fees')."  Knowles Decl., Ex. O (Prospectus) at 62 (emphasis added); *accord* Knowles Decl., Ex. A (SAI) at 102–03.  At the Board's discretion, each class of TRF shares may pay a different rate of distribution and/or servicing fees if a class receives services of a different kind or degree than other classes.  *Id*. at 101.  Class B, C, and R shares pay both servicing and distribution fees, and Administrative Class and Class D shares pay "distribution and/or servicing" fees.  *Id*. at 103, 115, 117.  Class A shares, however, pay only servicing fees.  Knowles Decl., Ex. O (Prospectus) at 62;

---

[3]     Morningstar agrees.  In a notable example of the plaintiff's cherry-picking of quoted sources, the Complaint selectively omits the following bolded text when quoting Morningstar's commentary on the Fund:  "The fund's annual expense bite, at 0.46%, certainly looks reasonable at first blush.  **It's a lot lower than most retail fund classes and even clocks in below average among other institutional funds of its ilk.**  But we're talking about the largest mutual fund in the world here, with more than $240 billion in assets.  PIMCO's decision to actually raise the fund's price from 43 basis points a couple of years ago looked downright greedy.  **The bottom line is that the fund's institutional price tag is fair, if not a little difficult to justify for one this large.**"  Knowles Decl., Ex. H (Morningstar, PTTRX: Analyst Report, *It's not quite time to start worrying about this Fund,* Nov. 15, 2011).

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 10

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax: 617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

*accord* Knowles Decl., Ex. A (SAI) at 102−03, 128.  Instead of 12b-1 distribution fees, investors in Class A shares pay an initial sales charge that, as its name suggests, is deducted at the time of investment rather than charged throughout the course of the investment.  Knowles Decl., Ex. O (Prospectus) at 59.  The initial sales charge for Class A shares declines for purchases that reach certain volume thresholds or "breakpoints" and may be waived in certain instances.  *Id.*

PIMCO Investments spends the servicing fees paid by all Retail Plans, including Class A shares, to provide or procure a variety of services to Fund shareholders, including providing compensation to broker-dealers, certain banks and other financial firms (collectively, "financial intermediaries") who (1) aid in processing purchase or redemption requests or cash dividends; (2) provide periodic information to shareholders, including account and confirmation statements; (3) provide individualized advice to shareholders concerning the suitability of particular investment opportunities; (4) provide sub-accounting, account maintenance and/or tax reporting; and (5) respond to shareholder inquiries.  Knowles Decl., Ex. A (SAI) at 103; Knowles Decl., Ex. O (Prospectus) at 62−63.  The vast majority of the servicing and distribution fees received by PIMCO Investments are not retained by PIMCO Investments but are instead passed through to financial intermediaries, who, in turn, provide the services described above.  Knowles Decl., Ex. A (SAI) at 102−04.

### D. PIMCO Funds Board of Trustees and the Contract Approval Process

Over the course of each year, the PIMCO Funds Board undertakes a rigorous process to consider whether to approve the Advisory Contract and the SAA (collectively, the "Agreements") and the 12b-1 Plans for an additional one year term.[4]  In connection with the 15(c) approval process, PIMCO provides the Board with written materials throughout the year relaying information about the Fund's performance and operations, and the services provided by PIMCO, including, but not limited to:

- Investment performance information;

---

[4]       The Board met on August 12-13, 2013 and on August 11-12, 2014 and approved the Agreements for another one-year term ending August 31, 2014, and August 31, 2015, respectively.  Knowles Decl., Ex. E (SR) at 88; Knowles Decl., Ex. P (PIMCO Funds Semiannual Report at 79 (Sept. 30, 2013) ("SR 2013")).

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 11

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

- Information about the nature, extent, and quality of services provided by PIMCO, including the oversight of other service providers;

- Operational information, such as information about the Fund's and PIMCO's compliance program, shareholder services, valuation, custody, and distribution;

- Comparative industry data with regard to investment performance, advisory and supervisory and administrative fees and expenses;

- Financial and profitability information regarding PIMCO's relationship with the Fund;

- Information about the personnel providing services to the Fund, PIMCO's compensation philosophy and structure, and the relationship between compensation and recruitment and retention of quality personnel;

- Information about the fees charged and services provided to other clients; and

- Factors driving fees including the type and complexity of the services provided, the cost of providing services, the risk assumed by PIMCO in the development of products and the provision of services, the impact on potential returns from different levels of fees, the competitive marketplace for financial products, and the attractiveness of potential Fund returns to current and potential investors.

Knowles Decl., Ex. D (SR) at 88, 92−94; Knowles Decl., Ex. P (SR 2013) at 79.  Additionally, the Board requests and receives comparative fee and performance data prepared by Lipper, Inc. ("Lipper"), an independent third party provider of investment company performance and fee and expense data.  Knowles Decl., Ex. E (SR) at 89.  PIMCO seeks to price the Fund so that total expense ratios are at or below the Lipper median, and has done so consistently for years.  *Id*. at 92; Knowles Decl., Ex. Q (Morningstar, Inc. "Expense" Ratings PTTRX & PTTAX as of Dec. 31, 2014 (2011−14 comparison)).  With respect to the 12b-1 plans in particular, among other information, the Board receives quarterly written reports of the expenditures made under the plans and the purposes for which such expenditures were made.  Knowles Decl., Ex. A (SAI) at 104; 17 C.F.R. 270.12b-1(b)(3)(ii).

Beyond the robust written materials the Board receives throughout the year, at each quarterly in-person meeting the Board reviews the Fund's investment performance and a substantial volume of information about the nature, extent, and quality of services the Fund receives from PIMCO.  Knowles Decl., Ex. E (SR) at 88; Knowles Decl., Ex. P (SR 2013) at 79−81.  Additionally, prior to the Board meeting where the annual 15(c) contract approvals are

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 12

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

considered (generally, in August), the Board, through its independent counsel, sends a lengthy questionnaire to PIMCO requesting information relevant to contract renewal; the trustees receive additional oral presentations related to the Agreements; and the full Board meets together, while the independent trustees also meet separately, without management.[5]  Knowles Decl., Ex. E (SR) at 89; Knowles Decl., Ex. P (SR 2013) at 79–80.  The independent trustees also discuss the 15(c) materials separately with their independent counsel.  *Id.*  In accordance with their duties under Section 15(c), the trustees also request and receive supplemental information from PIMCO regarding fund profitability and comparative performance information.  They analyze the experience, capability and integrity of PIMCO's senior management and other personnel; review PIMCO's overall financial strength and stability; and consider the ability of its organizational structure to address changes in assets under management, among other information.  *Id.*

Only after considering the extensive information presented by PIMCO in the rigorous 15(c) approval process, did the Board – including the independent trustees voting separately – conclude that "the nature, extent and quality of services rendered to the Funds by PIMCO [] favored the renewal of  the Agreements . . . [and that the Agreements] continued to be fair and reasonable to the Funds and their shareholders, that the Funds' shareholders received reasonable value in return for the fees paid to PIMCO by the Funds under the Agreements, . . . and that the renewal of the Agreements . . . was in the best interests of the Funds and their shareholders."  Knowles Decl., Ex. E (SR) at 96; Knowles Decl., Ex. P (SR 2013) at 86.  It is this considered determination that the plaintiff seeks to overturn by having the Court substitute its judgment in place of the business judgment of TRF's independent trustees.

---

[5]     Sixty percent of the current Board is independent, which exceeds all potential ICA requirements, including that 40% or more of a board is independent of the adviser and, in instances where a fund director, officer or employee is an interested person of the principal underwriter, that more than 50% is independent of the principal underwriter.  Compl. ¶ 136; *see* 15 U.S.C. §§ 80a-10(a), 80a-10(b)(2).

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 13

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

**ARGUMENT**

I.   **COUNT I FAILS TO STATE A PLAUSIBLE CLAIM FOR EXCESSIVE ADVISORY AND ADMINISTRATIVE FEES UNDER SECTION 36(B) OF THE ICA**

   A.   **Legal Standard for Pleading a Section 36(b) Claim**

   The standard established by the Supreme Court to show a breach of Section 36(b) is exacting.  To show a violation of an investment adviser's "fiduciary duty with respect to the receipt of compensation" from a fund, the plaintiff must allege and prove that the challenged fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining."  *Jones*, 559 U.S. at 345–46 (emphasis added).  The pleading requirements mandate that, to withstand a motion to dismiss, a complaint must plead factual allegations that are sufficient to state a claim for relief that is "plausible on its face."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) (citation omitted).  Although a court must "take all of the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* (citation omitted).  "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim."  *Id.* (citation omitted).  Thus, in the context of a Section 36(b) claim, "a complaint may not simply allege in a conclusory manner that advisory fees are 'excessive.'"  *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 327 (4th Cir. 2001).  A plaintiff may only survive a motion to dismiss by "alleg[ing] facts that, if true, would support a claim that the fees at issue are excessive."  *Id.*  That is, he must support a claim that the fees are "so disproportionately large" relative to the services provided that they are outside of what "could" have been bargained at arm's-length.

   Courts have identified a non-exclusive list of factors – commonly referred to as the "*Gartenberg* factors" – that may be considered in determining whether a challenged fee meets

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 14

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

the "so disproportionately large" standard, including: (1) the independence, expertise, care, and conscientiousness of the board of trustees in evaluating adviser compensation; (2) the extent to which the adviser realizes economies of scale as the fund grows larger; (3) comparative fee structures (meaning a comparison of the fees with those paid by similar funds); (4) the nature and quality of the services provided to the fund and shareholders; (5) the profitability of the fund to the adviser; (6) the adviser's cost in providing the service; and (7) any "fall-out financial benefits" (meaning collateral benefits that accrue to the adviser because of its relationship with the mutual fund).  *Jones*, 559 U.S. at 344 & 344 n.5 (citing *Gartenberg*, 694 F.2d at 928).  A court weighs these factors in view of "all relevant circumstances."  *Id*. at 347.  Importantly, these factors are merely a rubric for considering whether challenged fees meet the ultimate standard of beyond arm's-length bargaining.    They do not comprise the standard itself.  *Id.* at 346–47 (referring to "the range of fees that might result from arm's-length bargaining as the benchmark for reviewing challenged fees" and the "correct . . . basic formulation of what § 36(b) requires").

### B.    The Complaint Misconstrues *Jones v. Harris Associates* and Fails to Assert the Plaintiff's Claim under the Correct Standard of Liability

From the very outset, the plaintiff starts out on the wrong foot.  The Complaint incorrectly asserts that a Section 36(b) claim may be based *either* on excessive fees *or* on an allegedly flawed fee approval process.  *See* Compl. ¶¶ 40–45.  While the plaintiff's allegations would fail in any event to raise a plausible claim of a flawed process, the Supreme Court has squarely rejected the notion that such a claim exists.  A court must answer the ultimate question of whether the adviser's fee is excessive, not whether the board process is reasonable or fair.  *See Jones*, 559 U.S. at 351–52 ("Section 36(b) is sharply focused on the question of whether the fees themselves were excessive."); *Gallus v. Ameriprise Fin., Inc.*, 675 F.3d 1173, 1179 (8th Cir. 2012) ("[A]fter *Jones*, a process-based failure alone does not constitute an independent violation of § 36(b).").  Although the rigor of the board process is a relevant *consideration* in assessing whether fees are "so disproportionately large," it is not an independent basis for liability.  *Jones*, 559 U.S. at 348, 351–52 (holding that while courts may accord appropriate deference to the independence, care, and conscientiousness of the fund's board in approving the challenged

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

advisory agreement, this factor is not dispositive); *Gallus*, 675 F.3d at 1180 & n.4 (noting that allegedly flawed board process does not imply an excessive fee but rather requires a court to "take a more rigorous look" at the outcome) (citation omitted).

### C. The Plaintiff's Conclusory Allegations About the Fund's Size and Presumed Economies of Scale Do Not Plausibly Establish that the Fees Were Outside the Range of What Could Have Been Bargained for at Arm's Length

The plaintiff's primary argument for "excessiveness" is that TRF's sheer size yields economies of scale for PIMCO that are not passed along to shareholders through the use of fee breakpoints. Compl. ¶¶ 75–87. As typically defined, economies of scale may exist when, as assets increase, revenues increase on a greater percentage basis than expenses. *Krinsk*, 875 F.2d at 411. To show economies of scale in this case, then, the plaintiff must allege facts to show: (i) that TRF's assets grew during the period in question; and (ii) that as the assets grew, the cost of providing services to TRF declined (as a percentage of revenue). *See id.* The plaintiff, however, alleges nothing more than that TRF is very large, and so there *must be* resulting economies of scale at PIMCO. Compl. ¶¶ 75–87.[6] And he points to industry commentators who have noted the absence of breakpoints. Compl. ¶ 79. But the *basis* for his claim that economies exist is only conclusory: He claims that "[i]n the case of the Fund, assets have grown dramatically over the past ten years, consequently, the investment advisory fees paid to Defendants have grown dramatically, despite the economies of scale realized by Defendants prior to the growth in assets." Compl. ¶ 75. And he includes two charts purporting to show a comparison of the fees as a percentage of the Fund's assets under management, to claim that the charts "reveal that the fees have not decreased as the assets under management change." *Id.* at ¶¶ 77–78. Those conclusory allegations – which simply parrot the obvious fact that asset-based fees increase in proportion to assets under management – are insufficient because they do not establish a

---

[6]     The plaintiff plucks references to "economies of scale" from PIMCO's marketing materials as support for his claim that economies of scale exist in the Fund. Compl. ¶ 81. The plaintiff's reliance on these websites and marketing materials is flawed. First, the materials on their face do not relate to TRF. Rather, the plaintiff cites to a "Strategy Overview" for PIMCO's Municipal Bond Funds. *Id.* Second, the plaintiff refers to PIMCO's "trading economies of scale" in its Municipal Bond strategies as evidence that investment management economies of scale must exist in TRF. But this website's reference to economies of scale with respect to *trading* costs (which are borne by the funds, not the adviser) in no way relates to the adviser's cost of managing a fund as a percentage of revenue.

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

plausible claim that economies of scale actually existed during the relevant time period, much less that PIMCO failed to pass on any such economies to the Fund.  Indeed, the plaintiff's allegations contradict themselves:  asserting that "assets have grown dramatically," (Compl. ¶ 75), *and* that in the relevant time period, the Fund suffered "over $60 billion in redemptions." Compl. ¶ 37.  As discussed below – and self-evidently – if breakpoints had been introduced, Fund investors would have paid *higher* fees as assets decreased.

Courts have routinely rejected the argument at the pleading stage that merely because a fund increased significantly in size, economies of scale must have existed.  *See, e.g.*, *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) ("Plaintiffs must make a substantive allegation regarding the actual transaction costs at issue and whether the costs per investor increased or decreased as the assets under management grew."); *In re Scudder Mut. Funds Fee Litig.*, No. 04 Civ.1921 (DAB), 2007 WL 2325862, at *16 (S.D.N.Y. Aug. 14, 2007) ("Plaintiffs do not explain how, but merely presume that, economies of scale were achieved."); *Kalish v. Franklin Advisers, Inc.*, 74 F. Supp. 1222, 1238 (S.D.N.Y. 1990) ("Plaintiffs in prior cases have argued in substance that since a fund increased dramatically in size, economies of scale must have been realized.  The courts reject that argument.").  Furthermore, "[e]conomies of scale allegations are insufficient where there are no allegations of the costs."  *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332, 338−39 (S.D.N.Y. 2007), *modified on other grounds,* 425 F. App'x 25 (2d Cir. 2011) (citation omitted).  Rather than alleging facts as to PIMCO's costs, the plaintiff merely hypothesizes that "[i]t simply does not cost a fund adviser ten times as much to render services to a ten billion dollar [] fund as compared to a one billion dollar fund," and that "at some point, the additional cost to advise each additional dollar in the fund . . . *approaches a number at or close to zero*."  Compl. ¶ 67 (emphasis added).  In other words, with no factual basis whatsoever, the plaintiff concludes that economies of scale in managing TRF are essentially infinite, *i.e.*, there is no additional incremental cost to manage the Fund as its asset grow.  This is pure *ipse dixit* and does not establish a claim that is "plausible on its face" as required by *Twombly* and *Iqbal.  See, e.g.*, *Salomon Smith Barney*, 528 F. Supp. 2d at

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

339 (finding plaintiffs' non-fund-specific economic analysis regarding theoretical economies of scale insufficient to state a claim).

Indeed, contrary to the plaintiff's threadbare conclusions, the fact is that the expertise and resources required for a large and complex fund like TRF (with literally thousands of portfolio holdings) to consistently outperform its peers over an extended period of time requires significant ongoing expenditures by PIMCO.  For example, in the Fund's public Semiannual Report disclosures regarding the 2014 15(c) approval process, the Board noted the extensive investments made by PIMCO just in the prior year to enhance its services, including in technology, operations, portfolio management capacity, portfolio security pricing, yield reporting and disaster planning.  *See* Knowles Decl., Ex. E (SR) at 90.  The plaintiff has failed to assert any facts concerning PIMCO's costs to plausibly allege that economies of scale existed under these circumstances, or that the cost of those enhanced services did not outweigh revenues to PIMCO from Fund fees – especially where TRF's assets declined.

Moreover, even if the Court accepts that the plaintiff has adequately pled the existence of economies of scale, the plaintiff suggests that the only way to share potential economies of scale with shareholders is through reduced fees or breakpoints.  But that conclusion also lacks a factual basis.  As PIMCO's public disclosures illustrate, there are multiple ways in which PIMCO shares economies of scale (if any) with its shareholders, including by pricing the funds "to scale from inception" and continually enhancing services provided to the funds in exchange for fees paid.  *Id.* at 94.

The plaintiff's conclusory claim that economies of scale existed and his failure to specify how any purported economies of scale were not passed on to TRF's investors are thus individually, and in combination, fatal to his claim.  *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007) ("If plaintiffs were allowed to state a § 36(b) claim based upon such paltry allegations, then any fund that grew over time while not simultaneously lowering its fees would be subject to suit under the ICA.  This cannot be allowed.").

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 18

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Finally, the plaintiff's economies of scale argument ignores the plaintiff's own allegation that TRF's assets under management have *declined* significantly during the one-year period for which he seeks recovery, *i.e.*, calendar year 2014.  Compl. ¶ 37.  Even accepting the plaintiff's primary allegations – that Fund management costs decline (as percentage of revenue) as assets grow – it necessarily follows that those costs (as a percentage of revenue) must have *increased* in 2014 as the Fund's asset base contracted substantially.  But the plaintiff and his fellow shareholders did not share in the burden of any cost increases through higher fees.  To the contrary, if the Fund's fee schedule featured "breakpoints" as the plaintiff suggests it should have, (Compl. ¶¶ 76–97), shareholders would have seen an *increase* in their fee rates during 2014.  But PIMCO's fixed fee schedule protects shareholders from that very outcome, as was considered and recognized by the Board in approving the fees:

> The Trustees also considered that the unified fee has provided inherent economies of scale because a Fund maintains competitive fixed unified fees even if the particular Fund's assets decline and/or operating costs rise.  The Trustees further considered that, in contrast, breakpoints are a proxy for charging higher fees on lower asset levels and that when a fund's assets decline, breakpoints may reverse, which causes expense ratios to increase.

Knowles Decl., Ex. E (SR) at 95.  This fact alone is fatal to the plaintiff's claim regarding economies of scale.  Especially under these circumstances, there is no way to read the Complaint's economies of scale allegations as establishing a plausible basis to conclude that TRF's below-median fees (which remained consistent as Fund AUM decreased over the relevant time period) were *outside* the range of what could have been negotiated at arm's length.

### D.    The Plaintiff's Comparison of TRF Fees to Those Charged to Other Types of Clients Are Inapt

The plaintiff's comparisons of TRF's fees to those paid by other PIMCO clients – *i.e.*, separately managed accounts (referred to in the complaint as "private investor" accounts), a sub-advisory client (the Harbor Bond Fund), and the Total Return Active Exchange-Traded Fund ("ETF") – are irrelevant.  The *Jones* Court specifically admonished that such comparisons should be given limited weight absent a factual predicate of comparable services.  559 U.S. at 350

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

(courts must be "wary of inapt comparisons" between services an investment adviser provides to different types of clients). The plaintiff sets forth no such predicate. He merely alleges that "upon information and belief," the private investor account contains "the same" or "substantially similar" underlying investments as those of TRF (Compl. ¶¶ 92, 94), and he offers no facts whatsoever about the services provided to Harbor Bond Fund or the ETF. He simply contends the services *must* be "the same" and "indistinguishable." *Id.* He then concludes that the comparators present the "range of fees" that might result from arm's-length bargaining and present a benchmark for reviewing TRF fees. Compl. ¶ 88. But absent facts about the services provided by PIMCO to different types of clients with different service needs, the plaintiff's conclusory assertion that "a mutual fund is no different from any other institutional investor" (Compl. ¶ 89) for the purpose of imposing service fees is insufficient to survive dismissal. *Jones*, 559 U.S. at 349.

The plaintiff does not set forth a factual predicate of comparability between TRF and the private investor accounts, Harbor Bond Fund, and the ETF precisely because the services provided to those types of clients are, in each instance, apples and oranges. First, the private, separately-managed account structure referred to in PIMCO's publicly-filed Form ADV cannot be compared to TRF's fee structure in light of the inherent variances in services provided. PIMCO's separately managed accounts generally require a minimum investment amount of $75 million. *See* Knowles Decl., Ex. R (PIMCO Form ADV Part 2A Brochure 2014 ("ADV")) at 33–34. PIMCO offers a "total return" strategy to separately managed account clients, but this does not take the form of an investment in TRF. Separately managed accounts are not subject to the same investment guidelines, services,[7] or regulatory protections (*e.g.*, daily net asset value ("NAV") pricing, daily liquidity, Board oversight) provided to mutual fund investors as mandated under the ICA. In approving the Fund's fees, the Board considered the various reasons for the differences between fund fees and separately managed account fees, including:

[7] For example, investors in PIMCO's separately managed accounts do not receive custodial services procured by PIMCO, and are therefore responsible for independently arranging for all custodial services – including negotiating custody agreements and fees and opening custodial accounts. Knowles Decl., Ex. R (ADV) at 29.

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 20

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone: 617.951.7000
Fax: 617.951.7050

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

"differences in the advisory and other services provided by PIMCO . . . , the manner in which similar portfolios may be managed, different requirements with respect to liquidity management and the implementation of other regulatory requirements, and the fact that separate accounts may have other contractual arrangements that justify different levels of fees."  Knowles Decl., Ex. E (SR) at 93.   Indeed, the Complaint makes an apples-to-oranges comparison of the standard *advisory* fee (0.25% to 0.50%) for separately managed accounts to the *total* fees and expenses (advisory, supervisory/administrative, distribution and servicing) paid by the Fund (Compl. ¶¶ 94–97) – when in fact the *advisory* fee for the Fund (0.25%) actually matches the lowest end of the advisory fee schedule for the separately managed accounts.

Second, Harbor Bond Fund is an externally sponsored mutual fund that cannot be aptly compared to TRF.   Harbor Bond Fund's adviser, Harbor Capital Advisers, Inc., employs a "manager-of-managers" approach, whereby it selects and oversees external sub-advisers to the mutual fund family it sponsors – including PIMCO in the case of Harbor Bond Fund.   Knowles Decl., Ex. S (Harbor Fixed Income Funds, Prospectus, at 23, 25 (Mar. 1, 2014, as supplemented Jan. 15, 2015) ("Harbor Prospectus")).   As the sponsor and adviser of TRF, PIMCO provides many additional services and assumes additional risks that do not apply when it serves as a sub-adviser to externally sponsored mutual funds like Harbor Bond Fund.   As described in TRF's Semiannual Report, the Board discusses these differences as part of the 15(c) approval process, including that PIMCO may be subject to varying levels of entrepreneurial risk and regulatory requirements, differing legal liabilities per contract and diverse servicing requirements when PIMCO does not serve as adviser of a fund.   Knowles Decl., Ex. E (SR) at 88, 92–94.   The plaintiff concedes that the investment advisory fee that TRF pays PIMCO as investment adviser is similar to the investment advisory fee that Harbor Bond Fund pays to its own investment adviser, Harbor Capital.   Compl. ¶ 100; *see* Knowles Decl., Ex. S (Harbor Prospectus) at 12, 23 (Harbor Bond Fund's institutional share class pays 0.53% for total annual fund operating

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

expenses, compared to 0.46% in total expenses for TRF's Institutional Class shares[8]).  But the plaintiff points instead to the apples-and-oranges comparison of (1) the fee TRF pays PIMCO as *investment adviser* to (2) the fee that Harbor Bond Fund's investment adviser pays PIMCO to serve as a *sub-adviser*.  That comparison is inappropriate because PIMCO serves in different capacities for TRF and the funds it sub-advises, including Harbor Bond Fund.[9]  *See Hoffman*, 591 F. Supp. 2d at 540 (recognizing that "investment advisers and sub-advisers perform distinct services," and that these "differences . . . alone justify" different fee arrangements).

Third, the plaintiff's comparison of TRF to the ETF is entirely without foundation, as an exchange-traded fund like the ETF is a fundamentally different product from a traditional "open-end" fund like TRF.  Unlike with open-end funds, ETF shares are purchased and sold by investors on exchanges or through broker-dealers acting as market makers, akin to shares in operating companies.  Whereas open-end funds offer liquidity on a daily basis at a price (the NAV) that is struck by the fund only once per day, ETFs offer investors intraday liquidity at prices that fluctuate with market movements constantly throughout the trading day.  While open-end funds offer shareholders visibility into the fund's portfolio holdings with a 60-day time lag, ETF holders can access fund holdings on a next-day basis.  ETF holders naturally pay no distribution or shareholder servicing fees, as PIMCO does not provide such services where ETFs are purchased and sold on exchanges and via third party broker-dealers. As the Semiannual Report acknowledges, different PIMCO funds and share classes are charged different fees, in part because of the "type and complexity of the services provided."  Knowles Decl., Ex. E (SR)

---

[8]    The plaintiff inexplicably compares Harbor Bond Fund's expenses for "all services" for its *institutional* class to the same fees paid by TRF's *Class A, B, and C* retail shareholders, rather than by TRF's *Institutional* Class.  Compl. ¶ 100.  In fact, Harbor Bond Fund does not offer any classes that have a 12b-1 distribution or servicing fee.

[9]    When PIMCO serves as a sub-adviser to a third-party fund, it may charge lower advisory fees than it charges to the Fund for a variety of reasons, including "the fact that PIMCO may be subject to varying levels of entrepreneurial risk and regulatory requirements, differing legal liabilities per contract and *diverse servicing requirements* when it does not serve as the sponsor of a fund and is not principally responsible for all aspects of a fund's investment program and operations than when PIMCO serves as investment adviser and sponsor."  Knowles Decl., Ex. E (SR) at 93 (emphasis added).  The services PIMCO provides to the Fund are thus not "similar," as the plaintiff asserts, to the services it provides to a third-party, unaffiliated fund for which PIMCO has a markedly lower level of regulatory and business risk, legal liabilities, servicing requirements, and is not principally responsible for the investment program and operations.

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 22

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

at 92.  Thus, even if TRF and the ETF "resemble" each other in some portfolio makeup and asset allocation, it does not follow that the services provided were comparable, and no facts in the Complaint suggest a relevant comparison.[10]

The Supreme Court in *Jones* specifically admonished courts to look warily on comparisons of the type the plaintiff proffers here.  *See Hoffman*, 591 F. Supp. 2d at 540 (finding comparative fee structures inapt because the complaint made no allegations about "the comparative performance or services . . . or expense ratios" of other funds).  This is especially important because Section 36(b) does not require a board to negotiate "the 'best deal' possible," *Krinsk*, 875 F.2d at 409, nor is fee parity required.  *See Jones*, 559 U.S. at 350 ("[T]he Court . . . must be mindful that the Act does not necessarily ensure fee parity between the two types of clients.") (citation omitted); *Migdal v. Rowe Price-Fleming Int'l, Inc.*, No. AMD 98-2162, 2000 WL 350400, at *3 (D. Md. Mar. 20, 2000) *aff'd*, 248 F.3d 321 (4th Cir. 2001) (classifying plaintiff's comparison to other funds charging lower fees and outperforming the fund at issue as "allegations of 'circumstantial' indicia of excessiveness [that are] legally insufficient . . . because these allegations do not remotely touch on the issue of what, if any, *relation* exists between the disputed fees on the one hand, and the services provided in consideration for their payment, on the other hand") (emphasis in original).  The lack of fee parity between TRF and the three handpicked clients indicates nothing about how TRF's fees are "so disproportionately large" when compared to the services PIMCO provides so as to support a 36(b) claim, and thus says nothing about whether TRF's fees were *beyond* what the Board *could have* negotiated.  Quite the contrary, the Board reviewed data comparing TRF's advisory fees to the standard fee rate charged to other accounts but "noted that the differences in fees were attributable to various factors" described in detail.  Knowles Decl., Ex. E (SR) at 93.  Because the plaintiff provides no

---

[10]     It is particularly ironic for the plaintiff to hold up the ETF as an example of an appropriate "arm's length" fee – as compared to TRF's allegedly excessive fee approved by the Fund's "dominated and unduly influenced" independent trustees (Compl. ¶ 146) – when the ETF's board of trustees is comprised of the very same individuals who sit on TRF's Board.

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

factual predicate to establish the nature, quality or costs of the allegedly comparable services, these allegations cannot make out a plausible claim under *Jones*.

Indeed, apart from the plaintiff's inapt comparisons to different types of accounts or product offerings, more relevant comparisons to *similar* mutual funds place TRF's charges easily within the range that the Fund's independent trustees "could . . . have bargained at arm's-length." As noted from the outset, TRF has produced long-term stellar returns that dramatically outpace both the Fund's benchmark and its competitors', while charging aggregate fees and expenses that were at or below both the mean and median fees for funds in its category.  *See* p. 6, *supra*.  That evidence of what "could have been bargained" – which the plaintiff ignores – is dispositive.

**E.    The Plaintiff's Recitation of the Remaining *Gartenberg* Factors Provides No Basis for a Conclusion that the Fees Were Outside an Arm's-Length Range**

**1.    The Plaintiff Fails to Allege that the Nature and Quality of the Services Provided by PIMCO Did Not Warrant PIMCO's Compensation**

The plaintiff's allegations regarding the services PIMCO provides TRF are scant.  He characterizes the advisory and distribution services as "straightforward:  Defendants select (buy, sell or hold), at their discretion, short-term instruments, corporate bonds and notes, U.S. Treasury obligations, U.S. Government agencies, sovereign issues, mortgage-backed securities, and other investments for the Fund and attempt to garner new shareholders of the Fund."  Compl. ¶ 109. But that dramatically oversimplified description of PIMCO's services (*i.e.*, selecting portfolio securities and selling fund shares) flies in the face of the description of the services set forth in the Advisory Contract and other public disclosures cited by the plaintiff in his complaint.  The Semiannual Report details the Board's consideration of the intense complexity of managing a fixed income fund like TRF (Knowles Decl., Ex. E (SR) at 92); the resulting array of traditional and synthetic instruments in which the Fund invests (*Id.* at 20–60) (*e.g.*, domestic and foreign corporate and sovereign debt, asset-backed securities, credit default swaps, interest rate swaps, repurchase agreements, foreign currency forward contracts); and the broad suite of services provided by PIMCO in managing the Fund (*Id.* at 89–91) (*e.g.*, making and executing investment decisions; continuous investments in information technology, new disciplines, recruitment and

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 24

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

retention of talented personnel, and enhancing resources and systems; providing frequent performance reports to the Board; daily management of TRF's counterparty risk). *Cf. Franklin Mut. Funds*, 478 F. Supp. 2d at 687 (dismissing complaint that failed to "address the actual services rendered to [the] Funds").

The Complaint then alleges that PIMCO's advisory services are of low quality by focusing solely on TRF's short-term relative underperformance, and simply ignores TRF's outstanding long-term performance.  Because "allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive," *Migdal*, 248 F.3d at 327, the Complaint does not create a plausible basis from which to conclude that the Board's approval of below-median fees could not have resulted from arm's length bargaining – especially in light of the Fund's exceptional long-term performance detailed above.[11]

Most significantly, the plaintiff's allegations do nothing to gainsay the obvious and publicly-disclosed fact that the independent trustees were provided extensive information about the Fund's short-term and long-term performance, as compared to its benchmark and peers – including information provided at the Board's request by third-party industry expert Lipper. Knowles Decl., Ex. E (SR) at 89.  Armed with full information regarding the scope of PIMCO's services and the Fund's historical investment performance, the Board approved fees that are below the median for its peer group in virtually every instance.  Here again, the plaintiff fails to assert a plausible basis for finding that this result *could not* have been one reached at arm's length.[12]

---

[11]     The folly of the plaintiff's focus on short-term performance for cherry-picked periods is highlighted by the fact that the Fund's short-term performance in very recent periods has once again been outstanding vis-a-vis its benchmark and peers. For example, TRF's year-to-date 2015 return for Institutional shares has been 1.90%, well ahead of its benchmark (1.14%) and peer group (1.22%) for the same period. Knowles Decl., Ex. T (Morningstar, Inc. Performance Ratings PTTRX, *available at* http://performance.morningstar.com/fund/ratings-risk.action?t=PTTRX (last visited Feb. 28, 2015)).

[12]     The plaintiff's attempt to denigrate the overall nature and quality of the services provided by PIMCO by recounting a handful of customer service issues he claims to have experienced with PIMCO's website and his account statements (Compl. ¶ 115) is likewise inadequate to establish a plausible claim.  Even taken as true, such anecdotes do not come close to suggesting that PIMCO's below-average to average fees could not have been bargained at arm's length in exchange for services provided to millions of shareholders in managing hundreds of billions of dollars.

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 25

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1
2
3

## 2. The Complaint Alleges no Basis to Question the Independence or Thoroughness of the Fund's Independent Trustees

As the plaintiff does not allege sufficient facts to call into question the independence of the independent trustees or the thoroughness of the Board process, the trustees' business judgment in approving the fees is entitled to considerable weight. *Jones*, 559 U.S. at 351 ("Where a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process.").

The ICA mandates that at least 40% of the members of the governing board of every registered investment company be disinterested, or independent of the investment adviser, 15 U.S.C. § 80a-10(a), and, in certain instances as discussed above, that a majority (*i.e.*, greater than 50%) of the board be independent of the distributor. 15 U.S.C. § 80a-10(b)(2). Independent trustees are *presumed* to be independent under the ICA, 15 U.S.C. § 80a-2(a)(9), and a plaintiff may only overcome that presumption by "alleging facts that, if proved, would render the directors interested." *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 144 (3d Cir. 2002). Here, the plaintiff's only allegations challenging the Board's independence relate to the Board's composition and compensation structure, namely (i) the retirement of two independent trustees in 2014, leaving the Board with "only" five trustees (of which two are interested and three are independent);[13] (ii) that the Board is chaired by a PIMCO executive rather than an independent trustee; (iii) that the same Board oversees a number of funds in the PIMCO mutual

---

[13] This allegation fails on its face, as the Board's composition even with two interested trustees out of five total trustees meets every potentially applicable ICA requirement, including at least 40% independence from the adviser and more than 50% in the case of the distributor. The fact that Morningstar publications set a three-quarters disinterested majority as "a best practice for mutual fund boards" does not alter this analysis. The plaintiff's bare assertion that by not replacing the recently retired independent trustees (who retired pursuant to the PIMCO Funds' trustee retirement policy) as of the date of the filing of the Complaint, the Board is "without sufficient independence to ensure the fee arrangements with defendants are negotiated in the best interest of the Fund and its shareholders" is both legally and factually unfounded. In addition, as disclosed in a proxy statement recently filed with the SEC, PIMCO Funds' shareholders are being asked to elect four new independent trustees at an April 2015 special shareholder meeting. And in any event, the relative number of interested and independent trustees is of limited practical import, given that a majority of the independent trustees is required to approve the Agreements and 12b-1 plans pursuant to a *separate* vote. 15 U.S.C. §§ 80a-15(c), 80a-12b-1(b)(2).

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 26

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone: 617.951.7000
Fax: 617.951.7050

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

fund complex; and (iv) the level of compensation paid to Board members for their services. Compl. ¶¶ 136–151.

None of the plaintiff's allegations overcomes the statutory presumption of trustee independence.  Indeed, courts have repeatedly rejected efforts like the plaintiff's to paint a fund board as "captive" by implication based on the compensation received by board members, the number of funds for which they serve as trustees, the presence on the board of a minority of "interested" trustees, and the fact that the board's chairman is one of the interested trustees.  *See, e.g.*, *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 345 (2d Cir. 2006) (finding "insufficient as a matter of law" allegations of the five directors' six-figure compensation, retirement benefits, and service on boards of many other mutual funds, businesses, and charitable organizations); *Migdal*, 248 F.3d at 331 (holding that allegations of a fund's disinterested directors' service on 28 to 38 other boards, significant compensation, inability to spend sufficient time on each particular fund, and dependence on the investment advisers for information and their board positions, did not support a claim that the disinterested directors were actually interested); *Krantz v. Fid. Mgmt. & Research Co.*, 98 F. Supp. 2d 150, 154–55 (D. Mass. 2000) ("Neither the ICA nor the SEC proscribes the use of interlocking boards within mutual fund complexes . . . [and] the mere fact that a director is compensated, even handsomely, for service does not constitute a disqualifying interest."); *accord Krantz v. Prudential Invs. Fund Mgmt. LLC*, 77 F. Supp. 2d 559, 563 (D.N.J. 1999), *aff'd*, 305 F.3d 140 (3d Cir. 2002); *Langner v. Brown*, 913 F. Supp. 260, 266 (S.D.N.Y. 1996); *Verkouteren v. Blackrock Fin. Mgmt., Inc.*, 37 F. Supp. 2d 256, 260 (S.D.N.Y. 1999); *Olesh v. Dreyfus Corp.*, No. CV-94-1664, 1995 WL 500491, at *3, *21 (E.D.N.Y. Aug. 8, 1995).

The plaintiff also asserts conclusorily that the information the defendants provide to the Board is "inadequate."  Compl. at p. 54.  Citing one Morningstar Stewardship Report, the plaintiff claims that "opacity" and "girth" of data "suggests that the [B]oard has not done all that it can to aggressively negotiate for better economies of scale or to at least help investors better understand why the fees they pay are appropriate," (Compl. ¶ 152) and avers that the Board

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

"failed to provide adequate transparency to shareholders, such as describing what kinds of expenses are included in the 'supervisory and administrative fees.'" *Id*. at ¶ 153. The plaintiff's "naked assertions" contain no factual content to permit an inference of even a mere possibility of misconduct, *see Iqbal*, 556 U.S. at 678, and are belied by the services provided for in the language of the SAA agreement itself, which is publicly filed. *See, e.g.*, Knowles Decl., Ex. N (SAA) ¶ 7(a)–(k) (enumerating expenses, including staff and facilities necessary to provide services; audits; transfer agent, registrar, dividend disbursing agent, and shareholder recordkeeping services; custodial services; quotations for calculating the value of each Fund's net assets; maintaining tax records; obtaining Portfolio Activity Reports; costs and fees associated with shareholder meetings and reports; legal fees; preparing and printing share certificates; insurance premiums; and membership dues). The Complaint further fails to identify any relevant information that the Board should have considered, but did not, in approving advisory fees. Not a single instance is alleged where the Board's meetings "invoked a course of action which prejudiced the shareholders of the funds and should have been resisted by the independent directors. Nor is a single instance alleged in which a proposal was 'rubber-stamped' without an informed decision." *Krantz*, 77 F. Supp. 2d at 563. Rather, the documents attached to the Complaint and the public record reflect a Board that exceeds any potentially applicable independence threshold and a 15(c) approval process that is extremely rigorous and has resulted in arm's-length fees. *See* Knowles Decl., Ex. E (SR) at 94–96. In this case, the plaintiff does not plead sufficient facts to plausibly suggest that the Board's approval of the particular fee arrangement was undermined by interested trustees. Accordingly, the Board's decision "is entitled to considerable weight, even if [this] court might weigh the factors differently." *Jones*, 559 U.S. at 351.

### 3. The Complaint's Allegations on the Fund's Profitability to the Adviser and Employee Compensation Have no Bearing on Whether the Fees are Beyond an Arm's-Length Range

The Complaint's thin allegations regarding PIMCO's profitability (Compl. ¶¶ 116–23) are nothing but a rehash of the equally thin allegations regarding economies of scale discussed

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 28

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

above.  The plaintiff essentially asserts only that TRF *must* be very profitable because of its very large size:  "it is clear that one of the world's largest mutual funds is astoundingly profitable" (Compl. ¶ 122), the support for which is simply that the Fund's fee revenues have grown in proportion with assets under management.  The plaintiff recites the fact that TRF's asset base is much larger now than it was ten years ago, resulting in a corresponding large growth in fee revenue.  *See* Compl. ¶¶ 122–23.  This unremarkable proposition of course says nothing about what has happened to PIMCO's profitability in the same period, because the plaintiff has nothing to say about PIMCO's *costs* in managing a growing portfolio – other than that "upon information and belief" the costs have not risen at the same rate as assets and revenues.  *Id.*  The Complaint is thus devoid of factual allegations that would permit even a reasonable inference of the profitability to PIMCO of its relationship with TRF.  *See Amron*, 464 F.3d at 344 (assertions regarding fees "are irrelevant to a showing of profitability without some allegation of the corresponding costs incurred").

Additionally, the Complaint focuses repeatedly on the alleged compensation levels of senior PIMCO executives.  Compl. ¶ 38–39.  To assert that the adviser's fees and profits must be excessive because PIMCO can afford to pay large sums to its employees, however, has the analysis backwards.  The test established by the Supreme Court compares the fees charged to the services provided for those fees.  It does *not* invite a "cost-plus" approach, where individual expense items of the adviser are held up as supposed evidence that the fees "must be" too high.  The lack of any logical connection between allegedly high employee compensation and disproportionately large mutual fund fees is apparent when taking into account the simple fact (acknowledged in the Complaint) that PIMCO has a large and diverse clientele that extends beyond the mutual funds.  Employee compensation is thus a red herring, as there is no basis for the plaintiff's implicit assumption that the allegedly high employee compensation results solely or even primarily from revenues from the Fund or mutual fund revenues generally, as opposed to those from other lines of business.  As noted in the SAI, PIMCO does not compensate its portfolio managers "based directly on the performance of any Fund" or account.  Knowles Decl.,

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Ex. A (SAI) at 96.  Since employee compensation is not linked to Fund performance or the size of the mutual fund business or any particular fund, such compensation is not indicative of TRF's profitability to PIMCO.[14]

But even if it were, although courts may consider a fund's profitability among other factors in evaluating whether an adviser's fee was so disproportionately large as to bear no reasonable relationship to the services rendered, courts have recognized that "Section 36(b) does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit." *Am. Mut. Funds Fee Litig.*, No. 04-CV-5593, 2009 WL 5215755, at *50 (C.D. Cal. Dec. 28, 2009) (citing S. Rep. No. 91-184, at 15 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4902); *see also Gartenberg*, 694 F.2d at 928 (Senate Report indicated that "a cost-plus type of [advisory] contract is not required").  Thus, the plaintiff's repeated reference to employee compensation is misplaced and should be rejected as irrelevant to the determination of whether the TRF's fees are out of proportion to the value of the services rendered.

### 4.   The Plaintiff Does Not Sufficiently Allege "Fall-Out" Benefits

Fall-out benefits are "collateral benefits that accrue to the adviser because of its relationship with the mutual fund."  *Jones*, 559 U.S. at 344 n.5.  The plaintiff's threadbare allegations rest upon statements PIMCO makes on its website and Semiannual Report touting its wide-ranging investment solutions and distribution platform.  Compl. ¶¶ 125−28.  The plaintiff simply notes the existence of these relationships but makes no effort to quantify the fall-out benefits, if any, accruing to PIMCO or their supposed effect on fees.  Thus, "he has necessarily failed to establish that such benefits, taken together with other surrounding circumstances, render the advisory fee so disproportionately large as to be beyond the range of what would have been negotiated at arm's length."  *Krinsk*, 715 F. Supp. at 495 (quotations omitted).[15]

---

[14]   Moreover, amounts paid to senior PIMCO personnel who serve as Managing Directors (such as Messrs. William Gross and Mohamed El-Erian, who are the focus of the plaintiff's allegations regarding compensation), include a profit-sharing component based on PIMCO's overall net profits, which is separate and distinct from traditional compensation such personnel may receive, and is not based directly on the performance of any individual PIMCO client such as TRF.  *See* Knowles Decl., Ex. A (SAI) at 96.

[15]   The Complaint asserts that "[b]rokerage commissions payable by the Fund to the Defendants (or their affiliates) constitute another fallout benefit."  Compl. ¶ 127.  This is flatly incorrect, as the SAI makes clear that PIMCO does not utilize affiliated brokers in effecting Fund portfolio transactions.  *See* Knowles Decl., Ex. A

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

**II.    COUNT II FAILS TO STATE A PLAUSIBLE CLAIM FOR EXCESSIVE DISTRIBUTION AND SERVICING FEES UNDER SECTION 36(B) OF THE ICA**

The standard for establishing "excessive" distribution and servicing (12b-1) fees is the same as for advisory and administrative fees: a shareholder must demonstrate that the fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining." *Jones*, 559 U.S. at 346 (emphasis added). The plaintiff here alleges very little about the services actually provided by PIMCO Investments to Fund shareholders in exchange for the 12b-1 fees, much less why those services bear no reasonable relationship to the fees.[16] His failure to do so is fatal to the claim. *See, e.g.*, *Yameen v. Eaton Vance Distribs., Inc.*, 394 F. Supp. 2d 350, 356 (D. Mass. 2005) (dismissing 12b-1 fee claim where plaintiff failed to allege "some relationship between fees charged and the services rendered that, if true, would support a claim that the fees are excessive"). Instead, the plaintiff simply contends that 12b-1 fees provide "*no*" value to shareholders and should not be allowed – a policy debate settled by Congress and the SEC many years ago, and resulting in the adoption of Rule 12b-1. Compl. ¶ 87 (emphasis added). Courts have frequently dismissed claims regarding 12b-1 fees when based on the same type of conclusory allegations. *See Hartford Inv. Fin. Serv., LLC*, No. 11-cv-1083 (D.N.J. Dec. 17, 2012); *ING Principal Protection Funds Deriv. Litig.*, 369 F. Supp. 2d 163, 169 (D. Mass. 2005) (dismissing complaint where plaintiffs failed to allege the "fundamental claim" that "the distribution fees are disproportionate and unrelated to the sales-related services actually provided"); *Yameen*, 394 F. Supp. 2d at 353.

The plaintiff's 12b-1 claim warrants dismissal because he makes no allegations about the quantity or quality of services PIMCO Investments provides in connection with the 12b-1 fees, other than to baldly assert that shareholders receive no benefit from them, which is a policy

---

(SAI) at 147 ("The Funds did not pay any commissions to affiliated brokers during the fiscal years ended March 31, 2014, 2013 and 2012.").

[16]      The Complaint includes only a brief summary description of the services associated with these fees: "[t]he distribution and servicing fees are alleged to cover the cost of acquiring new customers to the Fund and for maintaining new shareholder accounts." Compl. ¶ 57. This statement does not represent the full range of services PIMCO Investments provides or procures for the Funds, but even if it did, the plaintiff does not state a plausible claim that these services bear no reasonable relationship to the fees.

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 31

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone: 617.951.7000
Fax: 617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

argument, not a factual allegation sufficient to survive dismissal.[17]  Compl. ¶¶ 62, 87.  The plaintiff acknowledges that the 12b-1 fees "are alleged to cover the cost of acquiring new customers to the Fund and for maintaining new shareholder accounts" (Compl. ¶ 57), but in no way suggests that the fees "bear[] no reasonable relationship to the services rendered."  *Jones,* 559 U.S at 346.  Moreover, the plaintiff's economies of scale argument fails when lobbed against the 12b-1 fees, just as it fails in relation to the advisory and administrative and supervisory fees.  A conclusory allegation that TRF's dramatic growth *must* have produced economies of scale that delivered "little or no" benefit to shareholders, which is all the plaintiff can muster, is insufficient to plausibly suggest that the fees were excessive.  Compl. ¶ 86; *see Goldman Sachs,* 2006 WL 126772, at *9 (dismissing 12b-1 claim where "[m]ere assertions that fees increased with the size of the Funds [was] not enough to establish that the benefits from economies of scale were not passed on to investors").[18]  Finally, the Complaint's allegations fail to account for the fact that the vast majority of the 12b-1 distribution and servicing fees received by PIMCO Investments are passed through to financial intermediaries, who, in turn, provide the relevant services.  PIMCO Investments cannot be held liable under Section 36(b) for the fees passed through to third parties.  *See Pfeiffer v. Bjurman, Barry & Assocs.,* No. 03-civ-9741(DLC), 2006 WL 497776, at *36 (S.D.N.Y. Mar. 2, 2006), *aff'd,* 215 Fed. Appx. 30 (2d Cir. 2007) (dismissing

---

[17]      The plaintiff also contends that the distribution fees are "based on the net asset value of the Fund and not on the distribution activity, if any, by Defendants such as number of shares sold."  Compl. ¶ 62.  This allegation does nothing to advance the plaintiff's claim.  Pursuant to statutory authority, the Financial Industry Regulatory Authority ("FINRA"), the self-regulatory organization charged with principal regulatory oversight for SEC-registered broker-dealers such as PIMCO Investments, explicitly allows broker-dealers to receive distribution fees calculated on the basis of assets under management – and the SEC has approved FINRA's rule.  *See Yameen,* 394 F. Supp. 2d at 354-55 (discussing FINRA Rules, including rule that service fees may not exceed 0.25% of the fund's average annual *net asset value*); Order Approving Proposed Rule Change Relating to the Limitation of Asset-Based Sales Charges as Imposed by Investment Companies, Securities and Exchange Act of 1934 Release No. 30897, 57 Fed. Reg. 30985-02, 30989 (July 13, 1992) (agreeing that FINRA's fee limit has "carrie[d] out [its] congressional mandate to prevent excessive sales charges on mutual fund shares").

[18]      The plaintiff also asserts, without citing any facts, that generic advances in "computing and communication technologies" over the past two decades must have produced "exponential efficiencies" that have "dramatically reduced the costs of servicing mutual funds."  Compl. ¶ 85.  Even if true, this allegation is irrelevant and, more importantly, inadequate to salvage the plaintiff's failed 12b-1 claim.  A conclusory assertion that the costs of providing services declined does nothing to establish that the fees are outside the bounds of what could have been bargained at arm's length.

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 32

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone: 617.951.7000
Fax: 617.951.7050

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

36(b) claims where 12b-1 fees were passed through to financial intermediaries, because distributor was not the ultimate "recipient" of the fees under § 36(b)).

Count II of the Complaint fails as a matter of law and should be dismissed.

### III.   THE PLAINTIFF LACKS STANDING TO ASSERT CLAIMS ON BEHALF OF SHARE CLASSES HE DOES NOT OWN

Even if the Court determines that the plaintiff has asserted a valid claim as to one or more of the fees challenged in the Complaint, those claims must be limited in scope only to those share classes the plaintiff actually owns.  As reflected in the plaintiff's account statements referenced in the Complaint, he holds shares in only one of the Fund's eight share classes – namely, Class A, which comprises only about 10% of TRF's assets.  *See* Knowles Decl., Ex. U.  In his Complaint, however, the plaintiff purports to assert this action for the benefit of all share classes. But the plaintiff lacks standing to challenge fees associated with the classes of shares that he does not own.  The differences in fees paid in respect of the share class he owns and the classes he does not create irreconcilable conflicts between those shareholder groups.  Since, as the plaintiff acknowledges, a Section 36(b) claim is at root a "derivative" action, the law limits standing to a plaintiff who fairly represents the interests of similarly situated shareholders.

The gravamen of the plaintiff's claims is that the defendants charged the Fund fees that are "so disproportionately large that [they] bear[] no reasonable relationship to the services rendered and could not have been the product of arm's-length negotiations."  Compl. ¶ 1.  But the plaintiff's own allegations make plain that the categories and amounts of fees paid to the defendants are different for each shareholder class – and no other class pays the same amount of total fees as the plaintiff does for his Class A shares.  For example, paragraph 47 of the Complaint sets forth the fees, broken out by share class and fee category, and demonstrates that the total fees range from 0.46% for Institutional Class shares to 1.60% for Class B and C shares – with the plaintiff's Class A shares paying 0.85%.  Moreover, the plaintiff's Class A shares do not pay a distribution component of a 12b-1 fee *at all*, unlike five of the other share classes (Administrative, B, C, D and R).  Compl. ¶ 47.  Rather, unless a waiver applies, investors in

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 33

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Class A shares pay a one-time sales commission at the time of purchase. Compl. ¶ 48 (Class A sales commissions ranging from 0.00% for purchases over $1 million to 3.75% for purchases under $100,000). Further, the total expense ratio for Class A shares (0.85%) includes a 0.25% shareholder servicing fee (payable pursuant to a Rule 12b-1 plan) applicable only to certain retail share classes (A, B, C and R), which is not paid by other classes that do not have Rule 12b-1 plans (*e.g.*, Institutional). Compl. ¶ 47.

In a derivative action, the plaintiff's role is to act for similarly situated shareholders and vigorously press their alleged claims. But as alleged in the Complaint, the plaintiff is in a fatally conflicted position. He plainly has not suffered the same ostensible injury – either in nature or in degree – as the shareholders in other classes. Comparing the proportionality of the challenged fees to the services rendered in exchange for those fees under *Jones* will necessarily require a share class-by-share class analysis. The plaintiff is simply not situated to argue why fees that are substantially *lower* or *higher* than – or *different in kind* from – those he himself paid are violative of the *Jones* standard. Those differences would oblige the plaintiff to argue with equal zeal that all of these fees were outside arm's-length range. Moreover, discussions regarding allocation of relative damages would inevitably put the plaintiff in the position of arguing the extent to which fees paid in respect of Class A shares that he owns should be reduced disproportionately to fees paid by other share classes. But that is precisely what establishes the irreconcilable conflict in this case, placing the plaintiff in the likely position of arguing *for* one class and *against* another.

The requirement that a derivative plaintiff be similarly situated to those whose interests he purports to represent stems from the nature of representative litigation. Because the named plaintiff in both class and derivative actions purports to act in the shoes of another, the law has always imposed a requirement of "fair and adequate representation." Indeed, the federal rule governing derivative cases (like its class action analog) imposes that very condition: the plaintiff must "fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." Fed. R. Civ. P. 23.1. By its terms, the rule does not permit mere adequate representation of the "corporation" or entity. It

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 34

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

equally insists upon adequate representation of the "shareholders or members who are similarly situated." *Id*. The recognition that shareholders of a corporation can have different personal, economic and litigation interests is reflected in the text of the rule and precludes the plaintiff from representing share classes he does not own.

Indeed, a similar result has been reached before in Section 36(b) litigation. In *Kasilag v. Hartford Investment Financial Services, LLC*, No. 11-civ-1083, 2012 WL 6568409, at *9 (D.N.J. Dec. 17, 2012), the district court dismissed a Section 36(b) claim about 12b-1 distribution fees for lack of standing because the share class held by plaintiff did not pay that fee. The court reasoned that a plaintiff who did not pay 12b-1 fees lacked the personal injury necessary to create a live case or controversy as to those fees. It followed that the interests of the named plaintiff and those of holders of other share classes were not congruent, precluding derivative case standing. Likewise, in other analogous contexts, courts have refused to permit derivative plaintiffs to proceed when their interests were not fully aligned with other shareholders. Just this past year, the Ninth Circuit reiterated its long-standing rule that "an adequate [shareholder] representative must have the capacity to vigorously and conscientiously prosecute a derivative suit and be free from economic interests that are antagonistic to the interests of the class." *Arduini v. Hart*, 774 F.3d 622, 635 (9th Cir. 2014) (quoting *Larson v. Dumke*, 900 F.2d 1363, 1367 (9th Cir. 1990)). In *Larson,* the Court specifically observed that although the question whether a derivative plaintiff was "similarly situated" to other shareholders was fact specific, different economic interests lay at the heart of the requirement. *Larson*, 900 F.2d at 1367 (listing factors).

So too here. The fees and expenses payable by *this* plaintiff in respect of his Class A shares are simply different from the fees and expenses payable by every other holder of every other share class in TRF. His interest in establishing whether any of the fees he does not pay are beyond what could have been negotiated at arm's length is minimal, and his conflict in purporting to allocate damages across fee classes is palpable. Accordingly, if this action proceeds at all (which it should not), the plaintiff should only be allowed to challenge fees paid

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 35

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

by Class A shareholders.  He has no standing to seek relief on behalf of any other shareholder class of TRF.

## IV.   SECTION 47(B) OF THE ICA PROVIDES NO SEPARATE BASIS FOR A RESCISSION CLAIM

In Counts I and II, the plaintiff seeks "rescission of the contracts" pursuant to 15 U.S.C. § 80-47(b), in addition to damages.  Compl. ¶¶ 164, 171.  The plain language of Section 47(b), however, makes rescission available only to a "party" to that contract.  *See Davis v. Bailey*, No. 05-civ-00042, 2005 WL 3527286, at *6 (D. Colo. Dec. 22, 2005) (rejecting requested rescission of advisory agreement because "[p]laintiffs were not parties" to it).  Because the plaintiff is not a party to either of the Agreements at issue, he lacks standing to seek their rescission.  The remedy available to shareholder plaintiffs under Section 36(b) is clearly set forth in that provision: Section 36(b)(3) limits a plaintiff's recovery to actual damages resulting from the breach, and provides that a plaintiff may not recover damages for any period prior to one year before instituting the action.  15 U.S.C. § 80a-35(b)(3).[19]  There is no basis for rescission.[20]

DATED:  March 6, 2015.                              By:  s/ Ronald L. Berenstain
                                                          s/ David F. Taylor
                                                          s/ Sean C. Knowles
                                                          Ronald L. Berenstain, WSBA No. 7573
                                                          David F. Taylor, WSBA No. 25689
                                                          Sean C. Knowles, WSBA No. 39893
                                                          **Perkins Coie LLP**
                                                          1201 Third Avenue, Suite 4900
                                                          Seattle, WA  98101-3099

---

[19]      "Congress also intended, by limiting recovery to one year, to curb the potential for increased costs of litigation and the abusive use of lawsuits." *Franklin Mut. Funds*, 478 F. Supp. 2d at 686 (citations omitted).  A plaintiff's recovery is limited to one year and does not include damages sustained *after* the filing of the lawsuit.  *Id.* ("Extending the right to recover damages beyond one year, therefore, would violate the text and intent of § 36(b).").

[20]      In addition, contrary to the plaintiff's demand, he is not entitled to a jury trial in this action. Courts have routinely held that 36(b) claims are equitable in nature – as they seek restitution for alleged breaches of fiduciary duty – and therefore do not fall within the Seventh Amendment's right to jury trial on actions at law. *See, e.g.*, *In re Gartenberg*, 636 F. 2d 16, 18 (2d Cir. 1980) ("The issue in this case involves the equitable inquiry whether the Trust adviser violated its fiduciary obligations by charging an exorbitant fee . . . . [Plaintiff] is not entitled to a jury trial."); *In re Evangelist*, 760 F.2d 27, 29 (1st Cir. 1985) ("Petitioner is not entitled to a trial by jury here, for petitioner's claim is basically 'equitable' in nature."); *Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1351 (7th Cir. 1990) (holding that plaintiff was not entitled to a jury trial because "the combination of a fiduciary duty with a restitutionary remedy in § 36(b) continues to put this statute on the equitable side of the constitutional line"), *rev'd on other grounds*, 500 U.S. 90, 95 n.3 (1991).  In the event the Complaint is allowed to proceed, PIMCO intends to move to strike the plaintiff's jury demand.

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 36

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

Telephone:  206.359.8000
Facsimile:   206.359.9000
Email:  rberenstain@perkinscoie.com
          dftaylor@perkinscoie.com
          sknowles@perkinscoie.com

Of Counsel

John D. Donovan (*Admitted Pro Hac Vice*)
Robert A. Skinner (*Admitted Pro Hac Vice*)
Amy D. Roy (*Admitted Pro Hac Vice*)
**Ropes & Gray**
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone:  617-951-7000
Facsimile:  617-951-7050
Email: John.Donovan@ropesgray.com
          Robert.Skinner@ropesgray.com
          Amy.Roy@ropesgray.com

John C. Ertman (*Admitted Pro Hac Vice*)
**Ropes & Gray**
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone:  212-596-9000
Facsimile:   212-596-9090
Email:  John.Ertman@ropesgray.com

Attorneys for Defendants Pacific Investment
Management Company LLC and PIMCO
Investments LLC

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 37

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

**CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2015, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notification of such filing to the email

addresses indicated on the Court's Electronic Mail Notice List.

DATED:  March 6, 2015.                          By:  s/ Ronald L. Berenstain
                                                      Ronald L. Berenstain, WSBA No. 7573
                                                      Perkins Coie LLP
                                                      1201 Third Avenue, Suite 4900
                                                      Seattle, WA 98101-3099
                                                      Telephone:  206.359.8000
                                                      Facsimile:   206.359.9000
                                                      Email:  rberenstain@perkinscoie.com

                                                      Attorneys for Defendants Pacific Investment
                                                      Management Company LLC and PIMCO
                                                      Investments LLC

DEFENDANTS' MOTION TO DISMISS
(No. CV 14-1987-RSM) – 38

**Ropes & Gray LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Phone:  617.951.7000
Fax:  617.951.7050

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000